# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

---

### No. ACM S32695

---

### UNITED STATES
*Appellee*

**v.**

### Lucio SALAMANCA
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

---

Appeal from the United States Air Force Trial Judiciary

Decided 4 November 2022

---

*Military Judge:* Brett A. Landry.

*Sentence:* Sentence adjudged on 4 March 2021 by SpCM convened at Hill Air Force Base, Utah. Sentence entered by military judge on 29 March 2021: Bad-conduct discharge, confinement for 70 days, reduction to E-1, and a reprimand.

*For Appellant:* Major David L. Bosner, USAF; Major Spencer R. Nelson, USAF.

*For Appellee*: Lieutenant Colonel Matthew J. Neil, USAF; Major Brittany M. Speirs, USAF; Mary Ellen Payne, Esquire.

Before KEY, ANNEXSTAD, and GRUEN, *Appellate Military Judges*.

Senior Judge KEY delivered the opinion of the court, in which Judge ANNEXSTAD and Judge GRUEN joined.

---

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

---

KEY, Senior Judge:

A special court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of committing abusive sexual contact upon another Airman, KB, in violation of Article 120, Uniform Code

of Military Justice (UCMJ), 10 U.S.C. § 920.[1] The military judge sentenced Appellant to a bad-conduct discharge, confinement for 70 days, reduction to the grade of E-1, and a reprimand.

Appellant raises six issues on appeal: (1) whether his conviction is legally and factually sufficient; (2) whether the military judge erred in qualifying a witness as an expert in clinical psychiatry; (3) whether the military judge erred by excluding evidence that KB had made positive comments in the past about Appellant's appearance; (4) whether the military judge erred by excluding evidence regarding KB showing Appellant a picture of a tattoo of hers; (5) whether Appellant's sentence is inappropriately severe; and (6) whether, in light of *Ramos v. Louisiana*, ___ U.S. ___, 140 S. Ct. 1390 (2020), the military judge was required to instruct the court members that a guilty verdict must be unanimous.[2] We have carefully considered issue (6) and find it does not require discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

KB was a co-worker of Appellant's in a medical logistics unit at Hill Air Force Base (AFB), Utah. At the time of Appellant's offense, he was the non-commissioned officer in charge of a warehouse in which KB performed some of her duties. Appellant was senior in grade to KB and had previously been KB's supervisor, but he was no longer KB's supervisor at the time relevant to his charged offense.

In the morning of 14 August 2020, Appellant and KB attended a retirement ceremony for another co-worker, Master Sergeant (MSgt) SD, at the base clinic. Shortly after noon, MSgt SD hosted a party at a pavilion elsewhere on the base to celebrate his retirement. Food and alcohol were available at the party; as MSgt SD's wife described the event, "People ate. A couple people drank. No big deal." KB testified that before the party, she "told everybody [she] was planning on getting drunk" at the party and that she "was going to sleep in [her] car . . . to get rid of it or just wait until [she was] not intoxicated anymore." One of KB's co-workers told KB she could stay in her nearby dormitory room to sober up before driving home to her off-base apartment rather than waiting in her car, but KB declined the offer. KB arrived at the party when it began, and

---

[1] All references to the UCMJ, the Military Rules of Evidence, and the Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant personally raises issue (6) pursuant to *United States v. Grostefon*, 12 M.J. 431, 435 (C.M.A. 1982).

Appellant showed up about an hour later. According to KB, MSgt SD told her that Appellant wanted to "smash or crush" KB, which KB understood to mean Appellant was interested in her sexually, but that she thought "it was just, like, a stupid joke." After another hour passed, the party wound down as nearly all the attendees had left, with only Appellant and KB remaining behind along with MSgt SD and his wife. Both Appellant and KB consumed alcohol at the party, but neither appeared drunk to either MSgt SD or his wife.

MSgt SD, his wife, Appellant, and KB sat at a picnic table at the pavilion and talked for approximately another hour. MSgt SD did not perceive Appellant and KB to be flirting with each other, while MSgt SD's wife testified she thought they were being flirtatious, agreeing with trial defense counsel's characterization of them laughing, "talking in low tones," and seeming "giddy."

After cleaning up the pavilion, MSgt SD and his wife said they were leaving to go back to MSgt SD's office to pack his things. They invited Appellant and KB to accompany them, but Appellant and KB did not. Instead, Appellant stayed behind in the parking lot with KB in her car.

Once the two were in the car, KB drove it to the other side of the parking lot so that the car was in a shaded area. At Appellant's court-martial, KB testified the two talked for some time until Appellant asked to see KB's phone. She gave him the phone and asked for it back "a few moments later." Once she had her phone again, she noticed there were "a lot of apps open," including her photo album—this struck KB as odd, as she typically closed the apps on her phone when she was finished using them, but she thought perhaps she had forgotten to do so on account of the alcohol she had consumed. At some later point, she gave her phone back to Appellant who asked if she had "naughty photos" on it. About this time, KB saw that Appellant was looking at her "hidden" photo album which contained explicit photos of KB. This led Appellant to ask KB about how she engaged in certain sexual activity—making a reference to something he apparently saw in the pictures. KB told Appellant that she thought of her body as a temple and she "only want[ed] certain people seeing it, touching it[,] or being in it." Appellant, in turn, began commenting on her body and asking if he could touch her legs. KB testified she told Appellant "the most he can do is poke it, because it's just skin and bones; it's nothing more." Appellant poked her leg and proceeded to start grabbing her thigh and then asked if he could "touch [her] butt," to which KB replied, "No. It's just fat."

KB testified that Appellant then put his hand between her legs and started touching her vagina, outside of her clothes. She said Appellant asked her "if [she] liked it," and she answered "no;" KB followed her response by telling Appellant that was the case because she had been raped. Appellant next asked KB what her breasts looked like and whether he could see them and touch them. KB said she told him "no," but Appellant tried to reach under KB's shirt,

leading her to slap her chest so that he would stop. Appellant pulled his hand back and KB told Appellant to "ask his wife" or "one of his exes," because she did not want to show him her breasts.

KB said Appellant continued to talk about sexual topics, to include asking KB whether she liked having her hair pulled. After he asked this question, he reached over and pulled the hair at the base of her neck. He then asked her if she had been bitten before, at which point Appellant leaned over and bit KB on her neck and asked if she liked it. KB said "no." Appellant then started asking KB about vibrating underwear, which KB had apparently once owned, and asking her about "the placement of it, how big it was."[3] KB testified that while Appellant was asking about "the placement," he started touching her vagina again, "rubbing it, and longer than the first time," asking, "Is it here where it vibrates?" While this was going on, Appellant had KB's phone, and KB said she was trying to keep her eyes covered up so that Appellant could not utilize her phone's facial-recognition unlocking feature. KB also testified that when Appellant touched her vagina this second time, she "was scared," "didn't know what to do," and "just couldn't move."

Notably, KB was never asked if she consented to Appellant touching her vagina, nor did she directly testify that she had not consented to Appellant touching her there. KB did testify, however, that at some point after Appellant touched her leg, but before he touched her vagina for the second time, she left the car to go to a nearby restroom. While in the restroom, she sent a message to Staff Sergeant (SSgt) GA, who was stationed in Korea and with whom KB was in an "exclusive" relationship.[4] KB said she told SSgt GA "something happened," and SSgt GA replied, "What?" At that point, Appellant called KB, leading KB to wonder if Appellant "heard [her] writing somebody."[5] KB then wrote SSgt GA back, "Nothing happened. You know how I get. I talk a lot and I get distracted."

Eventually, KB told Appellant she needed to go home and walk her dogs. Before Appellant got out of KB's car, he asked if they "were going to still be on for moving the couch the next morning." Once KB was driving off the base, she called SSgt GA and told him that she had lied and something had happened. She explained what had transpired and eventually disclosed that Appellant was the perpetrator. KB had been reluctant to identify Appellant, since he and

---

[3] We presume this is a reference to the placement of the vibrating mechanism.

[4] Both KB's and SSgt GA's testimony was vague about the nature of the relationship. KB testified that they had lived together and "were, like, exclusive, but there was [sic] no labels on it."

[5] KB explained that her phone was still wirelessly connected to her car at the time.

SSgt GA were good friends, and she only identified him after SSgt GA pleaded at length with her to do so. KB did not want to report the incident and asked SSgt GA not to, but SSgt GA insisted on informing a senior noncommissioned officer, letting KB know afterward that he had done so. SSgt GA was called as a witness and largely corroborated KB's testimony about their phone call, to include specifics about what KB said had happened between her and Appellant in her car. During his cross-examination, the Defense was able to establish that KB had omitted certain details in the conversation, such as that she had given Appellant permission to poke her leg.

The next day, KB was interviewed by Air Force Office of Special Investigations (AFOSI) agents. During that interview, Appellant sent KB a message via an online social media platform. Screenshots of the ensuing conversation were admitted into evidence and show, *inter alia*, KB telling Appellant she was "uncomfortable about the wh[ ] situation."[6] Appellant replied:

> I'm sorry [neutral face emoji] I want to apologize for ma[ ] you feel that way
>
> Definitely not a good idea to drink like [ ] again
>
> That definitely was not my intention at [ ]

KB asked Appellant if he remembered what he had done, leading Appellant to respond, "I wanted to talk to you about it as well [ ] apologize." KB again asked if Appellant remembered, and he wrote back:

> Most. Definitely didn't mean to make th[ ] weird. I definitely should've just left. I a[ ] sorry for what happened and I promise [ ] won't happen again and I definitely do[ ] want things to change between us. You [ ] one of the few I actually like at the shop and [ ] on
>
> Yesterday was definitely all my fault. I'm sorry for making it uncomfortable [frowning face emoji]

KB wrote: "Do you remember touching me? Like [ ] chest/vagina/leg+thigh area," to which Appellant replied, "Omg [embarrassed face emoji] [KB]!" followed by 19 exclamation marks, and "I am super ashamed now and embarrassed!!!!!!" Appellant said he would like to talk to KB about what had happened, but she said she was uncomfortable doing so. Appellant wrote, "I am extremely embarrassed and ashamed," "My heart sank reading that message and I can [ ] how disgusted I feel with myself right now," and "It might not

---

[6] The screenshots were taken in such a way as to obscure characters near the right-hand edge of the screen. The brackets in the quotations taken from the screenshots reflect the non-visible characters.

mean much but [ ] sincerely sorry." According to the timestamps in the screen-shots, this entire exchange spanned about 20 minutes.

The Government called one of KB's co-workers to testify that KB told her—a few days after the episode near the pavilion—that "something had happened." The co-worker also said that in late August 2020, about two weeks after the initial conversation, KB went into more detail and that KB was "very emotional" and crying as she was doing so.

During KB's cross-examination, the Defense elicited the fact that while Appellant was in the car with her, KB left the car not once to go to the restroom, but four separate times. She said she only took her phone with her one of those times. She also acknowledged that her car was parked such that it was facing the gym and near both a camping area and the base gate which was manned by security personnel. She agreed that there were other people in the park directly in front of where the car was parked. KB also conceded that—in both her interview with the AFOSI agents and her pretrial interview with trial defense counsel—she never told interviewers that she said "no" to Appellant's advances. The Defense also called an AFOSI special agent who testified that in the AFOSI interview, KB only said Appellant touched her vaginal area once.

Several of Appellant's and KB's co-workers testified that the two had an overtly friendly relationship. One co-worker described Appellant's and KB's workplace interactions as "[p]layful or flirtatious" because they would laugh and KB would touch Appellant, "[m]aybe just a little tap in the shoulder and stuff like that." In response to a member's question, one co-worker agreed that there was "a general feeling or impression in the work center" that Appellant and KB "had sexual attraction towards each other." Another co-worker testified that Appellant and KB would go to lunch with each other, although KB testified they would never spend time together alone "[o]utside of work," as they would be "always with a group of people." KB conceded she would participate in unprofessional workplace conversations with Appellant and others covering such topics as their sexual activities and drunken behavior as well as calling each other derogatory and sexually explicit names. KB testified that Appellant was "a really good friend to [her]," that she "did trust him a lot," and that she would call him to talk whenever "something bad happened."

One of KB's co-workers testified that it was well known in KB's unit that KB wanted to leave Hill AFB and be stationed somewhere else. During her testimony, KB agreed with this sentiment, saying she was ready to be sent "[a]nywhere." In fact, prior to the abusive sexual contact episode, KB had volunteered for an assignment to Korea, among other places, and she received orders less than a week after the sexual contact for a tour at Osan Air Base (AB), Korea, to commence in the summer of 2021. SSgt GA, meanwhile, had an assignment to leave Korea for Yokota AB, Japan, that same summer. After the

investigation into KB's allegations began, KB met with the base sexual assault response coordinator (SARC) who told KB about the option of seeking an assignment to a base of her choice under the Air Force's expedited transfer program for sexual assault victims. KB decided to request a transfer to Yokota AB, which caused her Osan AB orders to be canceled. KB was then told that her Yokota AB request had been denied due to it being an overseas base, and that she would need to choose a stateside base. KB resubmitted her request with Washington state bases as her first and third choices and Yokota AB as her second choice, because SSgt GA was the "only support system" she had. She explained that she had no family or friends in Washington, but that SSgt GA's family lived there. Ultimately, KB was reassigned to a base in Washington about a month after the sexual contact. At Appellant's court-martial, KB testified that SSgt GA would be returning to Washington state in about two weeks for his mid-tour leave, and KB intended to spend time with him while he was there.[7]

## II. DISCUSSION

### A. Legal and Factual Sufficiency

On appeal, Appellant advances a variety of reasons why we should conclude his conviction is neither legally nor factually sufficient. He argues KB did not say "no" or "stop" to his advances; did not push his hand away; did not report the encounter herself; had "strong" motives to fabricate; and "changed her story" while testifying. We conclude Appellant's conviction is both legally and factually sufficient.

#### 1. Additional Background

Appellant was charged with a single instance of touching KB's vulva without her consent. KB, however, testified Appellant touched her vagina two separate times while they were in her car—apparently contrary to what she had told investigators and trial defense counsel.[8] The military judge expressed concern that legal and factual sufficiency review on appeal would be hampered by a general finding of guilty, since it would not be clear whether Appellant was convicted for the earlier touching or the later touching. The military judge decided, over the objections of both parties, to instruct the members that the charged touching was the second one.

---

[7] By the time of Appellant's court-martial, SSgt GA and KB were no longer in an exclusive relationship.

[8] Trial counsel's opening statement simply said Appellant "plac[ed] his hand on [KB's] vagina," and did not explicitly indicate the Government expected her to testify this happened on more than one occasion.

### 2. Law

#### a. Legal and Factual Sufficiency

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). We only affirm findings of guilty that are correct in law and fact and, "on the basis of the entire record, should be approved." Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) (quoting *United States v. Gutierrez*, 73 M.J. 172, 175 (C.A.A.F. 2014)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, the "standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (internal quotation marks and citation omitted). The "[G]overnment is free to meet its burden of proof with circumstantial evidence." *Id.* (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

#### b. Abusive Sexual Contact

As charged in this case, the Government was required to prove beyond a reasonable doubt that: (1) Appellant committed sexual contact on KB by touching her vulva, over her clothes, with his hand; (2) Appellant did so with the intent to gratify his sexual desire; and (3) the touching occurred without KB's consent. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt.

IV, ¶ 60.b.(4)(d). "Sexual contact" includes, *inter alia*, "touching . . . either directly or through the clothing, the vulva . . . of any person, with an intent to . . . arouse or gratify the sexual desire of any person." *MCM*, pt. IV, ¶ 60.a.(g)(2). "Consent" is defined as "a freely given agreement to the conduct in issue by a competent person," and "[a]n expression of lack of consent through words or conduct means there is no consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A). "All the surrounding circumstances are to be considered in determining whether a person gave consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(C).

The defense of mistake of fact is available to Appellant under the charge in this case so long as the circumstances as he mistakenly believed them to be would render his conduct non-criminal. Rule for Courts-Martial (R.C.M.) 916(j)(1). When a mistake pertains to an element requiring specific intent, that mistake "need only have existed in the mind of [Appellant]." *Id.* If, however, the mistake pertains to an element requiring only general intent, Appellant's mistake must not only exist in his mind, but it also "must have been reasonable under all the circumstances." *Id.* Once this defense is raised, the Government must prove—beyond a reasonable doubt—the defense did not exist. R.C.M. 916(b)(1).

### 3. Analysis

Appellant's arguments can be summed up as: KB was not credible and therefore her testimony cannot be believed; even if one assumes KB's testimony was credible, the evidence indicates she consented to the conduct; and even if KB did not actually consent, Appellant honestly and reasonably (but mistakenly) believed she had.

Regarding KB's credibility, Appellant argues KB had a motive to fabricate the assault in order to preserve her relationship with SSgt GA. This claim is fairly implausible, however, given the fact KB almost immediately reported the encounter to SSgt GA as she was driving off the base. Had KB in fact been trying to hide some sort of consensual sexual activity with Appellant, she could have simply not said anything about the encounter to SSgt GA, who was living on the opposite side of the world.

Appellant pivots from the theory of fidelity to SSgt GA to one which posits that KB falsely claimed she had been assaulted in order to obtain an expedited transfer to some other base, preferably one closer to SSgt GA. While KB's desire to be transferred elsewhere was uncontested, KB testified she was unaware of the expedited transfer program until she spoke to the SARC, which was after the investigation into the assault allegation was underway. No evidence to the contrary was presented. Moreover, by the time KB applied for an expedited transfer, she already had orders to leave Hill AFB the following summer. Most problematic for Appellant's theory is the fact KB did not actually

want to report the assault to anyone, and she begged SSgt GA not to do so. Both KB and SSgt GA testified regarding how reluctant KB was to disclose Appellant's identity to SSgt GA, much less report an assault to the authorities. Trying to avoid reporting an assault seems fundamentally at odds with trying to take advantage of a program for victims of sexual assault. Appellant does not explain how we should reconcile these incompatible goals. The more plausible scenario is the one KB testified to—that she only reluctantly facilitated the reporting of the offense, and she later learned about the expedited transfer option, which she decided to take advantage of.

Aside from arguing KB had a motive to falsely allege she was sexually assaulted, Appellant argues KB was simply not credible and her testimony should not be believed. His bases for this are that: KB said on the stand that Appellant had touched her vagina twice, while she told AFOSI agents it only happened once; on the day of the offense, KB had been drinking, so it is possible her ability to recall was impaired; she testified she told Appellant "no" when he asked to touch her breasts and her buttocks, but she told AFOSI agents she never said "no;" she testified that she had not spent time with Appellant alone, although another witness said KB and Appellant would go to lunch together; she did not remember several minor points (such as whether her car was turned on at a particular point in time and whether MSgt SD and his wife invited her to go to MSgt SD's office to pack). Such matters may very well negatively impact KB's credibility, but a rational factfinder could also conclude KB simply misremembered or did not recall certain peripheral facts. As to whether Appellant touched KB's vagina once or twice, a factfinder could conclude she was trying to bolster her testimony by making the situation seem all the more aggravated. But an equally plausible conclusion would be that KB inadvertently omitted certain details during her interview with AFOSI the day after the episode.[9]

As to the theory KB actually consented to the sexual contact, Appellant points to the nature of his pre-existing relationship with KB in which they were close friends who called each other sexually charged names and were perceived by others to be flirting on occasion. KB testified that MSgt SD had suggested to her at the party Appellant was interested in KB sexually, and KB nevertheless decided to stay after the party with Appellant and then go to her car with him. Once there, she participated in conversations about sexual matters, allowed Appellant to use her phone—knowing that she had sexually explicit photos stored on it—and gave Appellant permission to poke her leg. Appellant highlights the fact that when he touched KB's vagina, she did not tell him "no"

---

[9] KB testified that she did not sleep well the night before the interview and that, at the time of the interview, she was feeling "[p]retty horrible" and "[n]ot the greatest."

or "stop," nor did she try and push his hand away. When KB did tell Appellant he could not touch her buttocks, he did not. Similarly, when KB stopped Appellant from trying to touch her breasts, he did not try again, and when KB said she needed to go home, Appellant did not protest. Appellant also points to the fact that KB had ample opportunity to get away from the situation—such as when she left to go to the restroom four times—or to alert others or otherwise seek help. Instead, she repeatedly returned to the car and continued talking to Appellant.

Despite Appellant's contentions, a rational factfinder could readily conclude that KB did not, in fact, consent to Appellant touching her vagina with his hand. Although KB did not explicitly testify that she did not consent, the surrounding circumstances tend to show that she did not; namely, the facts that KB attempted to dissuade Appellant from touching her by telling Appellant her leg was just "skin and bones" and her buttocks were "just fat," telling Appellant he could only poke her leg after he asked for permission to touch it, denying Appellant permission to touch her buttocks, preventing Appellant from reaching under her shirt, refusing to show Appellant her breasts, telling Appellant she did not like it when he touched her vagina the first time due to the fact she had been previously raped, as well as the fact she did not initiate physical contact with Appellant at any point. The Government was permitted to use circumstantial evidence to prove KB's lack of consent, and a rational factfinder could conclude from this evidence that she did not. *See, e.g.*, *United States v. Williams*, No. ACM 39746, 2021 CCA LEXIS 109, at \*55 (A.F. Ct. Crim. App. 12 Mar. 2021) (unpub. op.), *aff'd on other grounds*, 81 M.J. 450 (C.A.A.F. 2021) (unpub. op.) ("Requesting members to draw inferences from such circumstantial evidence is a common aspect of court-martial practice."). This same evidence rebuts the notion that Appellant might have both honestly and reasonably believed KB was consenting to him touching her vagina.[10] Although evidence was presented that KB had the opportunity to remove herself from Appellant's presence, she was under no obligation to do so, and the fact she does not operate to undercut the evidence indicating that she did not consent.

Lastly, Appellant contends his text messages to KB the following day should not be seen as corroborating KB's claims. He characterizes the texts as apologizing for making KB feel uncomfortable, not for assaulting her. Appellant is correct that the text messages are somewhat ambiguous; however, a rational finder of fact could view the messages as Appellant's tacit, if not explicit, acknowledgment of his conduct. In those messages, KB initially stated

---

[10] Appellant's later apologies further undermine any claim that Appellant actually believed KB consented.

she felt uncomfortable about the situation, leading Appellant to say that he was sorry. KB's next message asked Appellant if he remembered what he had done, and Appellant replied that he "wanted to talk to [her] about it as well [ ] apologize." Appellant went on to say he felt "ashamed," "embarrassed," and "disgusted"—feelings not ordinarily associated with merely making someone else feel "uncomfortable." We also note the lack of any indication in the text messages that Appellant thought KB had consented to any of the conduct. Considering the texts in their entirety, one rational interpretation is they demonstrate a concession by Appellant that he had not obtained KB's consent before touching her vagina. *See United States v. McDonald*, 78 M.J. 376, 381 (C.A.A.F. 2019) ("The burden is on the actor to obtain consent, rather than the victim to manifest a lack of consent.").

Based on the foregoing, the evidence presented at Appellant's court-martial is legally sufficient to support his conviction. Furthermore, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt.

## B. Expert Witness Testimony

Appellant contends the military judge abused his discretion by permitting expert testimony regarding KB's reaction to Appellant touching her. We disagree.

### 1. Additional Background

KB testified that when Appellant touched her vagina the second time, she "was scared," "didn't know what to do," and "just couldn't move." It was at this point in time that KB told Appellant she needed to go home and walk her dogs. During KB's re-direct examination, trial counsel asked her why she did not honk her horn or go tell one of the people in the park in an effort to stop Appellant's advances. She answered, "I just freaked out. I froze." Trial counsel did not ask KB to identify at what point in the encounter she "froze." In re-cross-examination, KB acknowledged that she was not "frozen" when she was talking to Appellant in the car.

The Government sought to call Captain (Capt) MP to testify as an expert witness on the subjects of "counterintuitive behavior" and common reactions to traumatic situations, specifically the so-called "fight, flight, or freeze" responses. Shortly before she was called, trial defense counsel alerted the military judge they anticipated objecting to Capt MP's testimony. This led the military judge to have Capt MP provide initial testimony in a session convened pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a), outside the members' presence. In that session, Capt MP said that she received a Doctor of Osteo-

pathic Medicine degree after completing medical school, and then she performed a four-year psychiatry residency, the last three years of which were "all specialty mental health."[11] She subsequently received her board certification in general psychiatry from the American Board of Psychiatry and Neurology. Capt MP said she had seen "dozens" of patients, including victims of sexual crimes. She said that the concept of fight, flight, or freeze was part of her education and part of her practice, that she was aware of research on the concept, that she had reviewed literature related to it in preparation for the trial, and that the concept was widely accepted in the fields of psychiatry and psychology. At the time of Appellant's court-martial, Capt MP was the sole psychiatrist for Hill AFB's mental health clinic.

Capt MP, however, had never testified before, did not have a board certification for forensic psychiatry, and did not have any specialized experience in that field, although she had performed some "extra elective work" related to the field during her residency. Capt MP acknowledged she had never been published on victim "counterintuitive behaviors" or fight, flight, or freeze responses, nor had she lectured on the topic. Capt MP also said she had never evaluated a victim or an accused "in a forensic context."[12]

Trial defense counsel objected to Capt MP's qualifications, pointing to her lack of experience in forensic settings and the fact she had never published or spoken on counterintuitive behavior or trauma responses. The military judge overruled the objection under Mil. R. Evid. 702, concluding Capt MP's "expert scientific and specialized knowledge in the area of psychiatry could help the trier of fact to understand the evidence or to determine a fact in issue." He also concluded Capt MP's testimony "would be the product of reliable principles and methods" and that she had the capability to apply those principles to the facts of Appellant's case.

Trial defense counsel also raised an objection based on the United States Supreme Court's holding in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). In response to questions from the Defense and the military judge, Capt MP explained that the concept of fight, flight, and freeze behaviors is widely accepted in the fields of psychiatry and psychology, but that the term of "counterintuitive behavior" is "much more associated with the legal system than it is with the medical system." The military judge asked whether peer-reviewed publications attempted to document an error rate with respect to studies on fight, flight, and freeze responses. Capt MP responded, "Yes. I think

---

[11] Capt MP explained that a doctor of osteopathic medicine was "very similar to a traditional doctor or an MD," with an additional focus on "manual treatment, kind of similar to what a chiropractor would do."

[12] Capt MP did not evaluate KB in her preparation for Appellant's court-martial.

there's always—in every scientific paper I read, there's always a discussion of errors within the methodology, errors within the practice of collecting data, that kind of stuff, and errors within interpretation of data." Capt MP, however, did not identify any particular error rate applicable to the matters at hand.

Trial defense counsel objected to Capt MP's testimony on counterintuitive behavior, because it was "not beyond the ken of the average layman" and was "not helpful" because "[a]nything can be counterintuitive victim behavior." The military judge ruled that Capt MP would be allowed to testify about counterintuitive behaviors pertaining to the fight, flight, or freeze phenomenon, but not about broader counterintuitive behaviors. The military judge also said that he had considered the Mil. R. Evid. 403 factors and that he would not exclude Capt MP's testimony under that rule.

When the members returned to the courtroom, Capt MP testified that people who are "feeling overwhelmed in a moment of trauma . . . often have a bit of a narrowed perception" of their options and may "freeze" as opposed to fighting or running away. She elaborated that "freezing" could entail a variety of behaviors, to include "indirect sort of normalizing, negotiating type of interactions." According to Capt MP, when a person experiencing a traumatic situation is acquainted with his or her antagonist, the person is more likely to use de-escalation techniques in "a nonconfrontational way of interacting with the person who is traumatizing them." She also said that people who have been previously sexually victimized "are more likely to be on the freeze end of the spectrum than a more assertive fight or flight response." In response to a member question, Capt MP also said that when a person has a history of being victimized, it is possible "to interpret something that was meant one way in a more threatening way." Capt MP did not discuss whether or not she thought any of KB's behaviors fit this mold, nor did she provide any opinion about the facts of the case while testifying.

After Appellant's court-martial concluded, the military judge supplemented his oral ruling with a written ruling. The military judge found that Capt MP was familiar with the concept of "fight, flight, or freeze" responses to extremely stressful situations based upon "her academic studies, professional experiences, and review of publications and literature on the issue." He also found that the concept "has been widely studied in the fields of psychology and psychiatry," resulting in peer-reviewed studies "subjected to scientific scrutiny, to include analysis of error rates." The military judge concluded that although Capt MP was "a relatively new psychiatrist," she had "specialized knowledge that would assist the trier of fact to understand the evidence or to determine a fact in issue." Specifically, he determined that Capt MP could help the members understand the concept of "freezing" in response to a stressful situation

insofar as KB testified she "froze" when Appellant touched her—a fact the Defense had highlighted in an effort to suggest KB had not rebuffed Appellant's advances.

In his supplementary ruling, the military judge wrote, "Medical testimony regarding physiological responses to trauma . . . is clearly relevant in a case where the members are charged with evaluating the credibility of an alleged victim who has been challenged based on the reasonableness of her reactions to the charged offense." He concluded that Capt MP's testimony offered a potential explanation for why KB "did not defend herself more vigorously . . . or immediately flee her vehicle." Because Capt MP referenced studies, spoke to the general acceptance of the "fight, flight, or freeze" concept in the clinical psychiatry community, and confirmed the concept had been addressed in "numerous peer-reviewed academic papers utilizing rigorous scientific standards," the military judge concluded Capt MP's methodology and conclusions were reliable and that she qualified as an expert witness.

### 2. Law

We review de novo the question of whether a military judge performed the gatekeeping function required by Mil. R. Evid. 702 properly, and we review a military judge's decision to permit a witness to testify as an expert and any limitations placed on the permitted scope of that witness's testimony for abuse of discretion. *United States v. Flesher*, 73 M.J. 303, 311 (C.A.A.F. 2014) (citations omitted). A military judge abuses his or her discretion when the judge's "findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008).

Mil. R. Evid. 702 permits expert testimony when the witness "is qualified as an expert by knowledge, skill, experience, training, or education" so long as the testimony is helpful and based upon adequate facts, reliable principles, and reliable application of the principles to the facts. The United States Court of Military Appeals, predecessor to the United States Court of Appeals for the Armed Forces (CAAF), set out six factors derived from the Military Rules of Evidence for assessing the admissibility of expert testimony: (1) the expert's qualifications; (2) the testimony's subject matter; (3) the testimony's basis; (4) the relevance of the testimony; (5) the testimony's reliability; and (6) whether the probative value is outweighed by other considerations. *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993) (citations omitted). Shortly after *Houser* was decided, the Supreme Court decided *Daubert* and set out six non-exclusive factors to be considered in whether scientific evidence is reliable and

relevant. 509 U.S. at 593–95.[13] The CAAF has concluded that *Daubert* is consistent with *Houser*, and the *Daubert* decision provides "more detailed guidance on the fourth and fifth *Houser* prongs pertaining to relevance and reliability." *United States v. Griffin*, 50 M.J. 278, 284 (C.A.A.F. 1999). Although Mil. R. Evid. 702 has since been amended, *Houser* and *Daubert* are still employed in military courts to assess the admissibility of expert testimony under that rule. *See, e.g., United States v. Henning*, 75 M.J. 187, 191 (C.A.A.F. 2016). While *Daubert* focused on scientific testimony, its factors may still be considered in cases involving testimony based on technical or other specialized knowledge, but the factors do not necessarily apply in every case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (citation omitted). The Supreme Court has emphasized that trial judges are afforded broad latitude in deciding how to determine the reliability of expert testimony. *Id.* at 142 (citation omitted).

In the event of a nonconstitutional evidentiary error, the question is "whether the error had a substantial influence on the findings." *Flesher*, 73 M.J. at 318 (internal quotation marks and citations omitted). We consider four factors in determining whether the Government has demonstrated harmlessness: "(1) the strength of the Government's case; (2) the strength of the [D]efense's case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Id.* (citation omitted).

### 3. Analysis

Appellant generally attacks Capt MP's qualifications, Capt MP's failure to state an error rate, and the absence of a scientific test to determine whether or not a person actually "froze" in response to a traumatic experience.

We first note that the CAAF has "made it clear that expert testimony about the sometimes counterintuitive behavior of sexual assault or sexual abuse victims is allowed because it 'assists jurors in disabusing themselves of widely held misconceptions.'" *Flesher*, 73 M.J. at 313 (quoting *Houser*, 36 M.J. at 398). In *Flesher*, the CAAF determined that the military judge had not sufficiently analyzed whether the witness in question—a sexual assault response coordinator—qualified as an expert in "sexual assault." *Id.* at 314. In the instant case, however, Capt MP was not just a medical doctor, but one who specialized

---

[13] The six *Daubert* factors can be summarized as: (1) whether the theory or technique can and has been tested; (2) whether it has been the subject of peer review and publication; (3) the error rate; (4) standards in place for using the technique; (5) degree of acceptance within the scientific community; and (6) whether the danger of unfair prejudice substantially outweighs the evidence's probative value. *See United States v. Griffin*, 50 M.J. 278, 284 (C.A.A.F. 1999) (discussing the relationship between *Houser* and *Daubert*).

in psychiatry, having performed a four-year residency focused on the topic. Moreover, Capt MP was the base psychiatrist, and she explained that the fight, flight, or freeze concept was part of her education, is widely accepted in the psychiatric and psychological communities, and has been the subject of professional literature which she had reviewed in preparation for her testimony. Thus, we conclude Capt MP possessed qualifying knowledge, experience, training, and education related to psychiatric matters in general as well as the specific topic the Government wished to present. The fact she was testifying for the first time is of little significance, given the fact there must be a first time for every testifying expert.

Other than questioning Capt MP's ability to conclusively determine whether or not a particular person in fact "froze" in response to a traumatic experience, trial defense counsel did not meaningfully attack the concepts upon which Capt MP was testifying. On appeal, Appellant argues Capt MP did not explicitly state an error rate with respect to the literature on the fight, flight, or freeze concepts. However, Capt MP did not testify there was no established error rate. To the contrary, she said there was, but she did not state what that rate was during her testimony. In any event, solely focusing on the error rate of a widely known phenomenon of human behavior would hardly seem to be determinative on the question of admissibility, and instead would inform the weight Capt MP's testimony about the phenomenon should be given. Considering that the Defense largely focused on KB's conduct in the car in order to advance theories that KB actually consented to the conduct or that Appellant mistakenly believed she had, alternative explanations for KB's conduct were plainly relevant.

That said, we tend to agree with Appellant that the relevance of Capt MP's actual testimony was not great in light of the nominal evidence that KB actually fought, fled, or froze at any point during the encounter. Capt MP generally referred to people employing "negotiating type" behaviors as a type of "freezing," but she did not explain what aspects of KB's conduct, if any, fit into this category. Moreover, there was not any obvious evidence of KB "negotiating" with respect to Appellant touching her vaginal area. As noted above, Capt MP did not offer her expert opinion about the case, nor did she apply her knowledge to the facts of the case—instead, she just explained the science surrounding responses to traumatic events, none of which neatly lined up with KB's actual conduct. After all, KB left the car on multiple occasions, told Appellant "no" at certain times, physically resisted his attempt to reach under her shirt, conversed with him about a variety of topics, and ultimately ended the encounter by telling Appellant she needed to go walk her dogs. Based upon that factual foundation, it is not entirely clear how Capt MP's testimony would be helpful, although we acknowledge some members might have concluded KB was em-

ploying "negotiating" strategies in an unsuccessful effort to redirect Appellant's advances. Even though her testimony might have had relatively low probative value, we see no indication that such value was *substantially* outweighed by the danger of unfair prejudice. Instead, Capt MP's testimony would offer a potential alternative hypothesis for why KB acted the way she did—a hypothesis readily susceptible to being tested and countered by the Defense. Therefore, we conclude the military judge did not abuse his discretion in admitting the testimony.

Even if we found the military judge did abuse his discretion, we would find the error did not materially prejudice Appellant's substantial rights. We reach that conclusion, in part, for the same reason the testimony did not strongly correlate with the evidence: it provided the Government little pertinent ammunition tied to the facts of the case. KB testified she "just couldn't move" when Appellant touched her vagina the second time, but she told Appellant at that same time she needed to go home, effectively ending the encounter—conduct arguably at odds with the notions of being "frozen" or engaging in "negotiating" behaviors. The Defense effectively established the disconnect between Capt MP's testimony and KB's actual behavior, thereby diminishing the impact of Capt MP's testimony. The real force of the Government's case lay in KB's own testimony and Appellant's incriminating post-assault messages. As delivered to the members, Capt MP's testimony offered little commentary directly addressing the facts of the case. As a result, the Government's case and the Defense's case were comparable in terms of strength even without Capt MP's testimony, the materiality and quality of Capt MP's testimony was low in the face of the actual facts of the case, and we therefore conclude any error in admitting her testimony was harmless.

## C. Victim's Prior Acts

Because Appellant's third and fourth issues cover similar issues, we consider them together.

### 1. Additional Background

Prior to his court-martial, Appellant made a motion to admit certain evidence regarding KB's conduct prior to the assault.[14] The conduct relevant here is that KB had said she found Appellant attractive and that she had once shown Appellant a revealing picture of herself. The military judge found as fact that prior to Appellant's arrival at Hill AFB in 2018, KB searched for Appellant

---

[14] This motion was raised during a closed hearing. The transcript of that hearing, along the motion itself, the Government's response, and the military judge's ruling were all sealed by the military judge. We limit our discussion of sealed material to that which is necessary for our analysis.

on the Internet, as he was going to be her supervisor—apparently a common practice in the unit when members learned of newcomers. Once she found Appellant's Facebook page, she remarked that she thought Appellant was "'cute' or words to that effect." After Appellant arrived, KB made comments to others on occasion—about two times a year—that she thought Appellant "looked good" in civilian clothes. At some point in 2020, KB showed a picture to Appellant—in addition to some of their co-workers—of a tattoo she had recently acquired. The tattoo was on her ribcage, just below her breasts. In the picture, KB was wearing only underwear, and she was covering her breasts with one arm. According to testimony on the motion, KB was showing the picture to other co-workers. Appellant asked what she was doing, and KB said, "I'm just trying to show you my tattoo."[15]

The Defense's motion was styled as seeking the admission of evidence under Mil. R. Evid. 412. The military judge, however, concluded the comments about Appellant's appearance were evidence of neither KB's sexual behavior nor sexual predisposition, so the rule did not apply. In arriving at this conclusion, the military judge noted that he did "not ignore the common sense proposition that one might be more apt to engage in sexual behavior with someone he or she believes to be attractive." He added, "it is commonplace to note that someone is or is not attractive," and such comments had only a "tenuous connection" to notions of sexual behavior or predisposition. Nevertheless, the military judge concluded the evidence did not meet the threshold for relevance under Mil. R. Evid. 401, as it had "no tendency to make a fact of consequence more or less probable." Even if the evidence had some relevance, the military judge contended its probative value was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members." The military judge did not further explain why he concluded the evidence had no relevance or why it was substantially outweighed by the concerns he identified, but he ruled the Defense was prohibited from eliciting the evidence.

The military judge largely authorized the Defense to inquire into the nature of Appellant's relationship with KB, co-workers' observations about their relationship, and the pre-assault discussions of sexually explicit topics between Appellant and KB. The military judge did not, however, permit the Defense to elicit evidence about the tattoo picture. He concluded that because KB had shown the picture to a group of people—as opposed to just Appellant—the incident would potentially portray KB as being "sexually open." He further determined evidence about the incident did not meet any exception under Mil. R.

---

[15] The Defense's motion covered a variety of other conduct between KB and Appellant. We only discuss the aspects of the motion Appellant challenges on appeal.

Evid. 412, and even if it did, its probative value was substantially outweighed by Mil. R. Evid. 403 considerations.

**2. Law**

We review a military judge's decision to admit evidence over objection for abuse of discretion. *United States v. Hyppolite*, 79 M.J. 161, 164 (C.A.A.F. 2019) (citing *United States v. Phillips*, 52 M.J. 268, 272 (C.A.A.F. 2000)). We employ the same standard for a military judge's ruling that excludes evidence under Mil. R. Evid. 412. *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citation omitted). A military judge abuses his or her discretion when the military judge's "findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *Miller*, 66 M.J. at 307. "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (quoting *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010)) (additional internal quotation marks omitted).

If proffered evidence has any tendency to make a fact of consequence more or less probable, then the evidence is relevant. Mil. R. Evid. 401. Absent a rule requiring otherwise, relevant evidence is admissible. Mil. R. Evid. 402. Even when evidence is relevant, a military judge may prohibit its admission when the evidence's probative value is substantially outweighed by such considerations as unfair prejudice, confusing the issues, and wasting time. Mil. R. Evid. 403. Military judges have "wide discretion" in applying the Mil. R. Evid. 403 balancing test; however, military judges are afforded less deference when they do not explain their analysis on the record, and we give them no deference when they do not conduct the analysis at all. *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000).

Under Mil. R. Evid. 412, evidence of an alleged victim's sexual predisposition and evidence that an alleged victim engaged in other sexual behavior is generally inadmissible. Mil. R. Evid. 412(a). The intent of the rule is to "shield victims of sexual assaults from the often embarrassing and degrading cross-examination and evidence presentations common to sexual offense prosecutions." *United States v. Ellerbrock*, 70 M.J. 314, 318 (C.A.A.F. 2011) (alteration, internal quotation marks, and citations omitted). One exception to this rule is when the evidence is of "a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the accused to prove consent." Mil. R. Evid. 412(b)(2). The probative value of such evidence must outweigh the danger of unfair prejudice to the victim's privacy in order to be admissible under the rule. Mil. R. Evid. 412(c)(3). "'Sexual behavior' includes any sexual

behavior not encompassed by the alleged offense," while "'sexual predisposition' refers to a victim's mode of dress, speech, or lifestyle . . . that may have a sexual connotation for the fact finder." Mil. R. Evid. 412(d). A second exception to this rule is when exclusion of the evidence would violate an accused's constitutional rights. Mil. R. Evid. 412(b)(3). It is the defense's burden to demonstrate the exception applies. *United States v. Banker*, 60 M.J. 216, 223 (C.A.A.F. 2004). In order to show that the exclusion of evidence would violate an accused's constitutional rights, the defense must show that the evidence is relevant, material, and favorable to his defense, "and thus whether it is 'necessary.'" *Id.* at 222 (quoting *United States v. Williams*, 37 M.J. 352, 361 (C.M.A. 1993) (Gierke, J., concurring)). The term "favorable" means the evidence is "vital." *United States v. Smith*, 68 M.J. 445, 448 (C.A.A.F. 2010) (citations omitted). Moreover, the probative value of the evidence must outweigh the dangers of unfair prejudice under a Mil. R. Evid. 403 analysis. *United States v. Gaddis*, 70 M.J. 248, 256 (CA.A.F. 2011).

**3. Analysis**

### *a. Comments About Appellant's Appearance*

On appeal, Appellant argues the military judge erred by excluding KB's comments about Appellant's appearance. Appellant points to the military judge's statement that it is "common sense" that a person is more likely to engage in sexual activity with someone he or she found attractive as an indication of the relevance of KB's comments. Appellant asks us to give the military judge's Mil. R. Evid. 403 decision "less deference" because the military judge placed no analysis of that matter on the record. Appellant's primary contention is that the evidence served to "elucidate the relationship" between Appellant and KB, as well as offer some evidence of KB's consent to Appellant touching her.

The Government responds that the comments were remote in time to the sexual misconduct, were innocuous, and were not the sort that would communicate any actual sexual interest in a person. The Government further notes the absence of evidence that any of the comments were ever communicated to Appellant. Even if the evidence should have been admitted, the Government asserts Appellant was not prejudiced given the fact he was able to introduce other evidence of his close relationship with KB, to include the perception in their unit that they acted flirtatiously toward each other.

On appeal, neither Appellant nor the Government challenge the military judge's conclusion that this evidence fell outside the ambit of Mil. R. Evid. 412. We similarly see no reason to question this aspect of the military judge's ruling. With respect to the issue Appellant has raised, we conclude the military judge did not abuse his discretion in excluding this evidence. Regarding Appellant's

argument about the military judge's Mil. R. Evid. 403 analysis, we note that the military judge determined the evidence was not relevant under Mil. R. Evid. 401. As a result, the military judge would not reach Mil. R. Evid. 403 because that rule is focused on the authority to exclude *relevant* evidence. As explained in Mil. R. Evid. 402(b), "[i]rrelevant evidence is not admissible," and there is no Mil. R. Evid. 403 analysis with respect to evidence which has already been found to be inadmissible. The military judge did not abuse his discretion in concluding the Defense failed to establish that KB's comments about Appellant's appearance were relevant to any fact of consequence in Appellant's court-martial. Quite simply, the question was whether or not KB consented to Appellant touching her vagina while they were in her car on 14 August 2020. The military judge was well within his discretion to find the fact KB had described Appellant as "cute" two years earlier and said a few times that he looked good in civilian clothes provides no indication of whether she consented to the sexual contact at issue.[16] As the military judge noted, comments about others' appearance are common conversation topics and—without more—do not evidence a desire to participate in sexual activity with the subject of the conversation. More relevant on this point would be KB's relationship with and interaction with Appellant close to the time of the alleged assault, evidence of which the Defense was permitted to present. Even if KB's comments could somehow be stretched to the point that they suggested she had some sexual interest in Appellant, their evidentiary value would be marginal, at best. Given the amount of evidence permitted about how others perceived KB's relationship with Appellant, that marginal value would be substantially outweighed by such Mil. R. Evid. 403 concerns as preventing the needless presentation of cumulative evidence, and the military judge therefore did not abuse his discretion by blocking its admission.

### b. Picture of KB's Tattoo

Like the comments about Appellant's appearance, Appellant contends KB trying to show him the picture of her tattoo was evidence that KB had a sexual interest in him. He argues the military judge should have admitted the evidence under both Mil. R. Evid. 412(b)(2) and 412(b)(3). Essentially, Appellant's theory is that KB attempting to show him the picture on a previous occasion "demonstrates her inclination, attraction, partiality, and/or desire to have a consensual sexual relationship with Appellant." Appellant connects the incident in the car with the tattoo picture by suggesting that in both cases, KB "gave her phone to Appellant to show him intimate pictures of herself."

---

[16] During the pretrial hearing on this matter, no evidence was presented that Appellant was aware of any of these comments, so they would not bear on Appellant's mistake-of-fact defense.

The military judge did not abuse his discretion in excluding evidence of this picture. A significant factor for our assessment is that KB did not exclusively show the picture to Appellant. Instead, she was showing it to other co-workers prior to Appellant becoming involved in the episode. Therefore, there is no indication KB was showing the picture in order to send some sort of "signal" to Appellant or to suggest that she was somehow specifically interested in him. We might see more relevance in the picture had KB showed the picture solely to Appellant, but that is not what happened here. At the most, the evidence of KB trying to show the picture to Appellant is evidence of the general nature of her relationship with Appellant—that is, that she felt comfortable enough with him to show him a picture of herself in her underwear. KB's willingness to show others the picture is the kind of evidence that would suggest KB's sexual predisposition insofar as it might have a sexual connotation for a factfinder. It is this sort of evidence that Mil. R. Evid. 412 bars. Because Appellant cannot demonstrate how KB showing the picture to her co-workers and then attempting to show it to him amounts to evidence she consented to him touching her vagina in her car, the evidence about the episode was inadmissible under Mil. R. Evid. 412(b)(2). Moreover, Appellant has failed to establish how the exclusion violated any constitutional right of his, especially given the marginal probative value of the evidence. The Defense was permitted to present a substantial amount of evidence about KB's relationship with Appellant, as well as to elicit the sensitive and sexualized nature of their conversation in the car. There was also no indication KB denied the picture episode, such that her credibility might be attacked upon it. As a result, Mil. R. Evid. 412(b)(3) offers Appellant no relief, and Appellant has not demonstrated the military judge abused his discretion in excluding the evidence.

## D. Sentence Severity

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). Our authority to determine sentence appropriateness "reflects the unique history and attributes of the military justice system, [and] includes but is not limited to considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citations omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d), UCMJ, 10 U.S.C. § 866(d). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense, the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (citations omitted). Although we have great discretion to determine whether a sentence is appropriate, we have no power

to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

Appellant argues that the adjudged bad-conduct discharge renders his sentence inappropriately severe. He focuses on challenges he faced as a child, the care he provided his severely injured brother, and his outstanding duty performance. He also claims that there were few—if any—aggravating aspects about his offense. He specifically relies on statements KB made during her initial interview with AFOSI agents in which she indicated she thought the incident was not particularly severe and that she did not want Appellant to be discharged from the military as a result. We first note that this interview was never admitted as evidence at Appellant's court-martial, so its relevance and context were unexplored at trial. Second, the interview took place the very next day after the sexual contact, so it very likely KB had not had sufficient time to fully process her feelings about the matter. Finally, KB took a very different position in the unsworn statement she submitted to the military judge in which she discussed, *inter alia*, how the incident had led to a deterioration of her mental health to the point that she had to be prescribed a new narcotic medication.

Even with the bad-conduct discharge, we do not find Appellant's sentence to be inappropriately severe. In the car, KB had already told Appellant she did not like it when he touched her vagina because she had been previously raped. Nevertheless, Appellant—a noncommissioned officer both senior in grade to KB and her former supervisor—persisted and touched her again without making any obvious effort to first obtain her consent. Considering Appellant, his record of service, his personal circumstances, and everything else in the record of trial, we conclude Appellant's sentence to a bad-conduct discharge, 70 days of confinement, reduction to the grade of E-1, and a reprimand is not inappropriately severe.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court